1
2
3
4
5
6
7

8 **UNITED STATES DISTRICT COURT**

9 **EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| JEFF J. COATS, SR., | ) Case No.: 1:14-cv-00712 - JLT |
| Plaintiff, | ) |
| | ) ORDER DIRECTING ENTRY OF JUDGMENT IN |
| v. | ) FAVOR OF DEFENDANT, CAROLYN W. COLVIN, |
| | ) ACTING COMMISSIONER OF SOCIAL SECURITY, |
| CAROLYN W. COLVIN, | ) AND AGAINST PLAINTIFF, JEFF J. COATS, SR. |
| Acting Commissioner of Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

Plaintiff Jeff J. Coats, Sr. asserts he is entitled to disability insurance benefits under Title II of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the record. Because the Court finds the ALJ identified legally sufficient reasons for rejecting Plaintiff's credibility and properly evaluated the medical evidence, the administrative decision is **AFFIRMED**.

**BACKGROUND**

The Social Security Administration denied Plaintiff's application for benefits at the initial level and upon reconsideration. (Doc. 7-3 at 25; Doc. 8-5 at 13-18) Plaintiff requested a hearing, and testified before an ALJ on May 23, 2012. (Doc. 7-3 at 25, 51) The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on June 15, 2012. (*Id.* at 25-42) The Appeals Council denied Plaintiff's request for review. (*Id.* at 2-4) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

**STANDARD OF REVIEW**

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

**DISABILITY BENEFITS**

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for

evaluating a claimant's alleged disability.  20 C.F.R. §§ 404.1520, 416.920(a)-(f).  The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level.  *Id.*  The ALJ must consider testimonial and objective medical evidence.  20 C.F.R. §§ 404.1527, 416.927.

## A.    Relevant Medical Evidence

Plaintiff reported his last day of work was on April 23, 2009, after which he "went on unemployment for a few days."  (Doc. 7-9 at 38)  On April 29, Plaintiff reported he "had the gradual onset of pain in his right hip while walking his dog," which "became incredibly severe." (*Id.*)  Plaintiff visited the emergency room, where "[p]lain films were negative for a fracture." (*Id.*)

Dr. Warren Borgquist first treated Plaintiff on May 7, 2009, "at which time [Plaintiff] was in tears from the severity of the pain."  (Doc. 7-9 at 38)  Dr. Borgquist ordered a CT scan, which was negative and showed "absolutely no signs of a fracture." (*Id.*; *see also* Doc. 7-9 at 81-82)  On May 8, Dr. Borgquist noted Plaintiff was "a little less miserable" but had "exquisite pain" with internal rotation of his hip.  (*Id.* at 38)  Dr. Borgquist prescribed prednisone and hydrocodone to Plaintiff.  (*Id.*)  At a follow-up appointment on May 14, Dr. Borgquist observed that Plaintiff moved "very cautiously" because "slight rotation of the hip hurts him." (*Id.*)  Upon examination, Dr. Borgquist found Plaintiff had tenderness "over the femoral triangle anteriorly and . . . posteriorly under the gluteal cleft." (*Id.*)  Also, when Plaintiff was on his back, he was "unable to raise his leg up at all because of the severity of the pain." (*Id.*)

On May 27, 2009, Plaintiff continued to report pain in his hip, as well as his low back, shoulders, and knee.  (Doc. 7-9 at 37)  Plaintiff also reported he had "a history of mood disturbances," which Dr. Borgquist believed was "probably related to alcoholism." (*Id.*)  In addition, Dr. Borgquist noted Plaintiff had "depression, but it is related to situations rather than underlying depression." (*Id.*)  Dr. Borgquist observed that Plaintiff was able to "move from the chair to the exam table much easier than a month ago." (*Id.*)  According to Dr. Borgquist, Plaintiff exhibited "[m]ild pain to palpation" in

his lumbar spine and his "hip remain[ed] exquisitely tender to internal rotation when he [was] sitting on the exam table." (*Id.*)

In August 2009, Plaintiff reported he still had "severe hip pain," and "could barely get his bone scan . . . because lying in that position just killed his right hip." (Doc. 7-9 at 34)  Dr. Borgquist noted the bone scan was negative, and the "etiology [was] undetermined" for the pain, which Plaintiff reported was a 5/10 and "10/10 when he stands." (*Id.*)  Plaintiff's prescription for hydromorphone was increased. (*Id.*)

On September 9, 2009, Dr. Borgquist noted Plaintiff said he had not had alcohol since his last check-up, "but he [was] freaking out," "extremely anxious," and tearful. (Doc. 7-9 at 33) Dr. Borgquist again found Plaintiff's right hip was "[t]ender to internal and external rotation with him sitting." (*Id.*) Plaintiff reported the "pain level [was] 5/10." (*Id.*)

In October 2009, Plaintiff had an MRI of his right hip, which Dr. John Bokelman found showed no fractures, "[n]o significant arthritic changes of the right hip or evidence of acetabular labral tear," and "[n]o evidence of iliopsoas bursitis or pelvic abscess." (Doc. 7-9 at 79)  Dr. Bokelman determined the findings were "suggestive of mild gluteus medius muscle strain bilaterally," although Dr. Borgquist said he could not find this on the MRI scan. (*Id.* at 28, 79)

Dr. Borgquist gave Plaintiff a shot of Depo-Meldol to treat the pain on October 27, 2009. (Doc. 7-9 at 28)  Plaintiff reported he was "having trouble with his alcoholism and pain management issues," but was attending Alcoholics Anonymous meetings. (*Id.* at 25, 28)  Dr. Borgquist noted Plaintiff needed to go to a rehab facility, but there were "no resources for that in [the] county." (*Id.* at 28)  In November and December 2009, Plaintiff continued to report having pain in his right hip and low back, which he said was a "7 out of 10." (*Id.* at 25)  Dr. Borgquist observed that Plaintiff was "tearful and crying . . . in the office and agitated much of the time, and then he [had] an incredible temper." (*Id.*) He diagnosed Plaintiff with bipolar mood disorder. (*Id.*)

Dr. W. Jackson completed a physical residual functional capacity and case assessment on December 31, 2009. (Doc. 7-8 at 2-13)  Dr. Jackson noted Plaintiff alleged "his hip is out of socket," but found the medical evidence "does not support his allegation." (*Id.* at 12)  According to Dr. Jackson, Plaintiff received "treatment for significant hip pain but imagining shows only gluteal strain." (*Id.*)

4

Further, Dr. Jackson observed that Plaintiff's "bone scan, CT and labs [were] not indicative of severe impairment." (*Id.* at 3)  Dr. Jackson opined Plaintiff was able to lift and carry 10 pounds occasionally and less than 10 pounds frequently, stand and/or walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour day.  (*Id.*)  Also, Dr. Jackson found Plaintiff was only occasionally able to climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds. (*Id.* at 5)  Dr. Jackson concluded Plaintiff was limited with his ability to push and pull in the lower extremities. (*Id.* at 3)  Dr. Jackson believed Plaintiff was required to avoid concentrated exposure to extreme cold and heat.  (*Id.* at 6)  Dr. Jackson explained that Plaintiff was "only partially credible," because the medical record did not support his allegations of his hip being out of place, or the severity of his alleged limitations.  (*Id.* at 12)  Dr. Jackson believed Plaintiff's condition would "likely improve within 12 months, but [it was] difficult to be sure."  (*Id.* at 13)

In January 2010, Plaintiff had an evaluation with Dr. Ariana DeMers, an orthopedist.  (Doc. 7-10 at 22-23)  Dr. DeMers observed Plaintiff was "tearful and extremely anxious."  (*Id.* at 22)  She found Plaintiff was "tender to palpation all over," and exhibited "significant pain" with internal rotation of his hips.  (*Id.*)  Dr. DeMers recommended Plaintiff take physical therapy, which caused Plaintiff to be "tearful."  (*Id.* at 23)  In addition, around the same time, Dr. Borgquist told Plaintiff to "stop smoking pot."  (*Id.* at 24)

Dr. Les Kalman conducted a psychiatric evaluation on January 26, 2010.  (Doc. 7-8 at 14)  He observed that Plaintiff's "posture was normal but his gait was antalgic," and Plaintiff ambulated with the assistance of a cane.  (*Id.*)  Plaintiff reported he would "get[] emotional, running hot and cold, and [had] mood swings."  (*Id.*)  He explained: "It doesn't take much to set me off. No patience, no tolerance. I'm in pain a lot."  (*Id.*) Also, Plaintiff "admitted to feelings of hopelessness, helplessness, and worthlessness and significantly diminished energy levels."  (*Id.*)  Plaintiff told Dr. Kalman he "had been using alcohol to deal with his moods," and had been sober for 90 days.  (*Id.*)  He admitted "he was in jail once in 2002 for [a] lewd act with minor," but felt the "charges were not justified."  (*Id.* at 15)  Plaintiff the fact that he was registered sex offender "has a significant impact on his ability to get housing."  (*Id.* at 15)  Plaintiff denied having suicidal or homicidal thoughts.  (*Id.*) Dr. Kalman found Plaintiff "exhibited an impaired memory" because "[h]e recalled none out of 3 objects at 5 minutes."

(*Id.*)  Dr. Kalman observed: "Mr. Coats present[ed] with a fluctuating mood, predominately anger and depression.  He was tearful, crying intermittently throughout the interview alternating with anger related to his current situation.  Also, he is despondent over his physical condition with chronic hip and back pain."  (*Id.* at 16)  Dr. Kalman diagnosed Plaintiff with an intermittent explosive disorder, "Adjustment disorder depressed secondary to medical condition," "R/O Bipolar disorder not otherwise specified." (*Id.*) Dr. Kalman concluded:

| | |
|---|---|
| I | He is able to relate with supervisors and co-workers; |
| II | He is able to deal with the public; |
| III | He is able to understand and carry out simple one or two step job instructions; |
| IV | He has a decreased ability to maintain attention and concentration; [and] |
| V | He is psychiatrically able to withstand stress and pressures associated with daily work activities. |

(*Id.*)  Dr. Kalman believed Plaintiff's mental condition was "not expected to improve significantly in the next 12 months" and gave him a GAF score of 50.[1]  (*Id.*)

Dr. Robert Paxton completed a mental residual functional capacity assessment and psychiatric review technique form on February 10, 2010.  (Doc. 7-8 at 17-30)  Dr. Paxton opined Plaintiff was "not significantly limited" with his ability to understand, remember, and carry out very short and simple instructions; but was "moderately limited" with the ability to understand, remember, and carry out detailed instructions.  (*Id.* at 17)  Also, Dr. Paxton believed Plaintiff was "moderately limited" with his ability to "maintain attention and concentration for extended periods."  (*Id.*)  He indicated Plaintiff was "not significantly limited" with the ability to maintain attendance and complete a normal workday without interruptions from psychologically-based symptoms, and was "not significantly limited" with the ability to respond appropriately to changes in the work setting.  (*Id.* at 17-18)  Dr. Paxton opined Plaintiff had mild restriction in his activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, and pace.  (*Id.* at 28)  Accordingly, Dr. Paxton concluded Plaintiff was "[a]ble to understand and remember work locations

---

[1] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV).  A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *Id.*

and procedures of a simple, routine nature involving 1-2 step job tasks and instructions." (*Id.* at 19) Further, Dr. Paxton opined Plaintiff "[w]ould be able to remain socially appropriate with co-workers without being distracted by them but would require limited public contact." (*Id.*)

Plaintiff began physical therapy, which he reported was "helping a little bit." (Doc. 7-9 at 17) In March 2010, Plaintiff still limped and reported it was "hard for him to walk." (*Id.*)  Plaintiff said he was "able to walk on the flat surfaces . . . a little better but the pain [was] so severe he require[d] large doses of opiate pain medication even to walk around normally." (*Id.*)  Plaintiff reported "his depression and mood swings [were] horrible" and he "had anger and rage behavior." (*Id.*) Dr. Borgquist concluded that Plaintiff's "mood disorder plus his sleep disturbance and his pain … make him unemployable." (*Id.* at 14)

In April 2010, Plaintiff reported he still could not walk "and any movement at all hurt[] him terribly." (Doc. 7-9 at 13; Doc. 7-11 at 77)  He was taking morphine "3 times a day for pain management and [was] still miserable." (*Id.*)  Dr. Borgquist opined Plaintiff was "clearly going to be disabled for at least a year, and perhaps the rest of his life." (*Id.*)  Again, Dr. Borgquist concluded Plaintiff's mood "disorder plus his hip pain in combination make him unemployable." (*Id.*)

On June 1, 2010, Plaintiff reported he continued to have right hip pain, which he stated was a "5/10." (Doc. 7-9 at 12)  Dr. Borgquist observed that Plaintiff limped "pathetically," and found he had tenderness "to palpation posteriorly, anteriorly, and with hip rotation." (*Id.*) Also, Dr. Borgquist noted Plaintiff had "gained 20 pounds" while taking Abilify, and said Plaintiff was "going to have to go off of it." (*Id.*)  On June 10, Plaintiff received a steroid injection in his right hip.  (Doc. 7-8 at 35)

On July 8, 2010, Plaintiff had an MRI on his lumbar spine.  (Doc. 7-8 at 33-34; Doc. 7-9 at 75-76)  Dr. Sangeeta Gambihir determined Plaintiff had "[m]ild right anterior cord impingement at T12-L1 due to a right paracentral disk bulge with associated osteophytic ridging;" "[m]ild to moderate L4-5, mild L3-4 and mild L5-S1 acquired central canal stenosis;" and "[m]ultilevel neural foraminal stenosis, greatest on the right at L5-S1 (mild to moderate)." (*Id.*)

On July 20, 2010, Plaintiff told Dr. Borgquist that his mood was worse, and he stopped taking Lamictal because he was still gaining weight.  (Doc. 7-9 at 10)  Dr. Borgquist opined Plaintiff's weight gain unrelated to the medicine, and because Plaintiff stopped taking his medication, his "[pr]obable

bipolar mood disorder" was going untreated.  (*Id.*) Also, Dr. Borgquist noted Plaintiff had received "a therapeutic injection into his right hip," which gave him "marked pain relief for about a week."  (*Id.*) However, Plaintiff reported the pain had returned, and he "continued to limp."  (*Id.*) Dr. Borgquist treated Plaintiff's pain in his left wrist with an injection of neutralized lidocaine, noting that "carpal tunnel injections are not curative and he should be evaluated for carpal tunnel surgery."  (*Id.* at 11)

In October 2010, Dr. Meador examined Plaintiff, who visited "for a routine med refill regarding a diagnosis of chronic low back pain." (Doc. 7-8 at 32)  Plaintiff told Dr. Meador that his pain was "controlled" with Kadian.  (*Id.*)  Dr. Meador found Plaintiff had "[n]o tenderness with palpation of the lumbar vertebrae," and "good range of motion to the back."  (*Id.*)  In addition, Dr. Robert Pollard treated Plaintiff "for left hand pain."  (Doc. 7-9 at 9)  Plaintiff told Dr. Pollard that for the past year, he "had progressive pain and numbness in his left hand, and his second through fifth fingers are numb with increased pain to his wrist at night."  (*Id.*)  He said the pain was "5/10 and worse at night."  (*Id.*) Dr. Pollard ordered an EMG to determine whether Plaintiff had carpal tunnel syndrome in his left hand. (*Id.*)  In addition, due to Plaintiff's "excessive weight gain," Dr. Pollard "recommended that he stop the marijuana and increase his activity."  (*Id.*)

Dr. Sara Richey treated Plaintiff for the first time on November 17, 2010, following the death of Dr. Borgquist.  (Doc. 7-9 at 5, 83)  She observed that Plaintiff was "a very complex gentleman with chronic pain, depression, history of alcoholism, active carpal tunnel syndrome, and unexplained hip pain."  (*Id.* at 5)  Dr. Richey noted that Plaintiff was "listed as bipolar," but because he was unable to "describe any high points, only low points," Dr. Richey did not believe he suffered from the disorder. (*Id.*)  Rather, she believed he "ha[d] a depression with mood disorder and alcoholism."  (*Id.*)  Further, Dr. Richey observed that he was "sad and tearful" and complained of "ongoing right hip pain," despite "normal MRI of the right hip."  (*Id.* at 5-6)  According to Dr. Richey, Plaintiff "was advised to go … to physical therapy twice a week for 12 weeks, but . . . was discharged because he kept no showing." (*Id.*) Plaintiff reported he was miserable on the pain medication, and "his pain [was] not controlled at all." (*Id.* at 6) He told Dr. Richey that he was "using medical marijuana, but trying to quit."  (*Id.*)  Dr. Richey found Plaintiff showed "some tenderness in the lower lumbar segments with exaggerated reaction to light touch," as well as "tenderness over the trochanter of the right hip and tenderness with

range of motion for both abduction and adduction." (*Id.*)  Further, Plaintiff's gait was "slightly antalgic." (*Id.*)

On December 17, 2010, Plaintiff had a follow-up appointment with Dr. Richey.  (Doc. 7-11 at 67)  Dr. Richey noted Plaintiff's urinalysis "showed some hydrocodone," which was "inconsistent with his prescription." (*Id.*)  In addition, Plaintiff was "supposed to be on Cymbalta 30 mg b.i.d., but he [had] not been taking it." (*Id.* at 68)  Dr. Richey observed that Plaintiff was "mildly impaired and less whiny," although he continued to show "some tenderness in the lower lumbar segments with exaggerated reaction to light touch." (*Id.*)  Plaintiff also exhibited "tenderness over the trochanter of the right hip," and had a "slightly antalgic" gait.  (*Id.*)  Dr. Richey believed the "negative hip imaging, negative bone scan," and MRI scans "cannot be completely correlated with his hip pain." (*Id.*)  Dr. Richey expressed concerns about Plaintiff's uncontrolled use of opiates and noted, "he must start making progress in order to keep getting pain medicine here. . . The patient must not use any Vicodin or any other prescribed opiates or unprescribed opiates whatsoever while he is getting pain medications from me.  He is to take his morphine only.  He can take ibuprofen.  He may not take any other opiate.  This was spelled out clearly and he verified understanding.  He will be allowed no other aberrant urine drug screens." (*Id.*)

On January 7, 2011, Dr. Savage gave Plaintiff an intake assessment at Forest Road Health and Wellness Center.  (Doc. 7-10 at 52)  Plaintiff reported he was "an emotional mess. . . all the time." (*Id.*)  Plaintiff believed he was "not even employable because [he was] such a freaking mess." (*Id.*)  Plaintiff said that on an average day, he would "just sit and watch TV," and eat because marijuana made him hungry.  (*Id.*)  Plaintiff said he had Cymbalta, which he believed "would help if he took it consistently" and remembered to take it.  (*Id.* at 53)  Dr. Savage observed that Plaintiff was "ponderously depressed, tearful and crying throughout the session," as well as "dysphoric, and somewhat impulsive, irritable at times in flashes of anger/ frustration." (*Id.*)  Dr. Savage diagnosed Plaintiff with "Major Depression, Recurrent, moderate;" chronic pain disorder; alcoholism, in sustained remission; and cannabis

dependence.  (*Id.* at 54)  Dr. Savage gave Plaintiff a GAF score of 40.[2]  (*Id.*)

Dr. Paul Martin conducted a psychological evaluation on January 17, 2011.  (Doc. 7-10 at 55)  Plaintiff reported he was "in extreme pain, described as 8/10."  (*Id.*)  Plaintiff also said he was depressed and had "problems with concentration and memory."  (*Id.* at 55-56)  Dr. Martin observed that Plaintiff "endorsed numerous symptoms of depression including low energy[,] poor motivation, social withdrawal, crying spells, anhedonia, and a sense of hopelessness." (*Id.* at 55)  In addition, he noted Plaintiff "became tearful," was "distressed and easily overwhelmed."  (*Id.* at 56)  Dr. Martin found Plaintiff's attention, concentration, and "[m]emory for recently learned information was adequate" because he "recited 3 out of 3 words after a brief delay."  (*Id.*)  Dr. Martin opined Plaintiff's "insight and judgement appeared to be fair but affected by chronic pain."  (*Id.*)  Dr. Martin concluded:

> The claimant had no difficulty understanding, remembering, and carrying out simple instructions.  He had no difficulty with detailed and complex instructions.  He had moderate difficulty maintaining attention and concentration for the duration of the evaluation.  His pace was severely decreased.  He demonstrated severe difficulty with pace and persistence.  He had severe difficulty enduring the stress of the interview.  He is likely to have severe difficulty adapting to changes in routine work-related settings.  Based upon observations of current behavior and reported psychiatric history, the claimant's ability to interact with the public, supervisors, and coworkers there appears to be moderate impairment.

(*Id.* at 57)  Further, he opined Plaintiff "would have difficulty sustaining his attention and concentration and cognitive effort secondary to his depression and chronic pain."  (*Id.*)  Dr. Martin gave Plaintiff a GAF score of 55, and noted his prognosis was guarded.[3]  (*Id.* at 56)

Dr. Fariba Vesali conducted a comprehensive orthopedic evaluation on January 25, 2011.  (Doc. 7-10 at 58)  Plaintiff's primary complaint was "[l]ow back pain," which he described as "constant, sharp, with occasional radiation to right ankle."  (*Id.*)  Dr. Vesali observed that Plaintiff was "not in acute distress," "did not have any difficulties to get on and off the examination table," and "did not have any difficulties to take off his shoes and put them on."  (*Id.* at 59)  In addition, Dr. Vesali noted Plaintiff walked "slowly with no particularly abnormal gait," although "[h]e deferred walking on toes

---

[2]  A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . .)."  *DSM-IV* at 34.

[3]  A GAF score of 51-60 indicates "moderate symptoms … OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)."  *DSM-IV* at 34.

and heels because of low back pain." (*Id.*)  Dr. Vesali determined Plaintiff's motor strength was "5/5 in bilateral upper and lower extremities including grip strength," but had "[d]ecreased light touch and pinprick sensation" in his right leg.  (*Id.* at 60)  Based upon the examination, Dr. Vesali indicated she did "not feel the condition will impose any limitations 12 continuous months." (*Id.* at 61)  Dr. Vesali concluded Plaintiff "should be able to walk, stand, and sit six hours in an eight-hour day with normal breaks," and "lift/carry 50 pounds occasionally and 25 pounds frequently." (*Id.*)  Further, she opined Plaintiff did not have postural, manipulative, or workplace environmental limitations.  (*Id.*)

At a follow-up appointment in late January 2011, Dr. Savage observed that Plaintiff was "tearful, doleful" and "constantly negative." (Doc. 7-11 at 112)  Dr. Savage determined Plaintiff's memory was intact, but his "[a]ttention and concentration [were] slightly impaired." (*Id.*)

In February 2011, Dr. Richey noted Plaintiff exhibited a "significant chronic pain disorder" and had "chronic right hip pain with negative imaging and negative bone scanning," as well as "lumbar spinal stenosis with some cord changes at T12-L1." (Doc. 7-11 at 62)  Plaintiff reported his pain level was "6 in his low back." (*Id.* at 63)  Plaintiff also reported he had "severe right hip area pain," which Dr. Richey believed was "out of proportion to findings on multiple types of imaging of the area." (*Id.*)

On March 1, 2011, Dr. Barbara Bammann conducted a consultative examination after a referral from Dr. Richey.  (Doc. 7-11 at 115)  Plaintiff reported he had "a sharp pain midline in the low back," which was aggravated by "everything or any movement." (*Id.*)  Dr. Bammann observed that he "was obviously distraught and had an antalgic gait on the right." (*Id.*)  Plaintiff had a positive straight leg raise test on the right leg, but negative on the left.  (*Id.*)  In addition, he "was diffusely tender throughout the low lumbar spine, but no one specific area of focal tenderness." (*Id.*)  Dr. Bammann opined: "He has a very limited ability to sit, stand or walk for any period of time.  He cannot do any lifting or carrying and he certainly cannot do any bending." (*Id.* at 116)  Dr. Bammann concluded Plaintiff had "a very legitimate disability from any kind of employment." (*Id.*)

Dr. Greg Ikawa reviewed the record and completed a mental residual assessment and psychiatric review technique form on March 1, 2011.  (Doc. 7-11 at 117- 27; Doc. 7-12 at 2-4)  Dr. Ikawa opined Plaintiff was "not significantly limited" with his ability to understand, remember, and carry out very short and simple instructions; and Plaintiff was "moderately limited" with the ability to understand,

remember, and carry out detailed instructions.  (Doc. 7-12 at 2)  Dr. Ikawa believed Plaintiff was "not significantly limited" with all other aspects of concentration, persistence, social interaction, and adaptation.  (*Id.* at 2-3)  Further, Dr. Ikawa opined Plaintiff had moderate restrictions in his activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, and pace.  (Doc. 7-11 at 125)  Dr. Ikawa concluded Plaintiff was "[a]ble to sustain simple and repetitive tasks" and was "[a]ble to relate and adapt."[4]  (Doc. 7-12 at 4)

In March 2011, Dr. Richey observed that Plaintiff was "moderately somatoform, but not tearful."  (Doc. 7-13 at 18)  Dr. Richey found Plaintiff had decreased testosterone, which was "related to his chronic opiate usage," and she sought approval of a testosterone gel.  (*Id.*)  She also noted Plaintiff was referred for a TENS unit trial, which Plaintiff said was "helping a lot."  (*Id.*)  However, Plaintiff did not comply with the request to "repeat serum protein electrophoresis with urine immunophoresis studies" or "to get an ultrasound of his abdomen to rule out liver disease."  (*Id.*)  Due to Plaintiff's continued report of "low back and right lower extremity sciatica pain," Dr. Richey referred Plaintiff to an orthopedist, Dr. Suneeta Chhugani.  (*Id.* at 17; Doc. 7-12 at 55)

Plaintiff reported Dr. Chhugani that his pain level was "4/10," and said his "current medication regimen [gave] him good pain relief."  (*Id.* at 57)  Upon examination, Dr. Chhugani found Plaintiff exhibited "mild tenderness" throughout his body:

> Patient has mild tenderness to extremes of range of motion at his shoulders bilaterally, right greater than left.  Flexion and abduction are worse than extension.  He has mild tenderness to extremes of range of motion at his ankle on the right side, as well as at his subtalar joint on the right side. … Remainder of the joints in the upper and lower extremities does not reveal any swelling, tenderness, limitation of range of motion, or deformity. … There is minimal tenderness in the region of his sacroiliac joints bilaterally; 11 out of 18 tender points of fibromyalgia are positive.

(*Id.* at 56)  In addition, Dr. Chhugani observed that Plaintiff "ambulate[d] with a normal gait without any ambulatory assistant device."  (*Id.*)  Dr. Chhugani diagnosed Plaintiff with fibromyalgia and osteoarthritis of the hands.  (*Id.* at 52)

Dr. Roger Fast completed a physical residual functional capacity assessment on April 22, 2011.  (Doc. 7-12 at 32-37)  Dr. Fast observed Plaintiff suffered from morbid obesity, lumbar degenerative

---

[4] Dr. Peter Bradley reviewed the medical record on September 15, 2011 and adopted "as written" the conclusion that Plaintiff "could sustain work effort at unskilled tasks." (Doc. 7-13 at 74)

disc disease with stenosis, right gluteal tendonitis, alcoholism in remission, and asthma.  (*Id.* at 33)  He opined Plaintiff was able to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk at four hours in an eight-hour day, and sit about six hours in an eight-hour day.  (*Id.* at 33, 36)  Dr. Fast found Plaintiff was able to "occasionally" engage in all postural activities including climbing, stooping, balancing, kneeling, crouching, and crawling.  (*Id.* at 34)  Dr. Fast noted Plaintiff had "developed increasing back pain and exams show[ed] some improvement in his hip."  (*Id.* at 36)  Dr. Fast gave more weight should be given to the opinion of Dr. Bammann because she "had the benefit of the lumbar imaging study showing DDD and stenosis."  (*Id.*)  Therefore, Dr. Fast believed the "medium RFC by Dr. Vesali is not restrictive enough."  (*Id.*)

At a follow-up examination on April 27, 2011, Dr. Chhugani reviewed x-rays of Plaintiff's right hip, shoulder, and ankle and found Plaintiff did "not have any evidence of inflammatory arthritis." (Doc. 7-12 at 52)  Plaintiff reported his pain was "6 out of 10, and that he "occasionally" suffered from depression.  (*Id.* at 54)  According to Dr. Chhugani, Plaintiff ambulated "with a mildly antalgic gait" and continued to have "mild tenderness" throughout his body.  (*Id.*)

In May 2011, Dr. Richey opined Plaintiff's chronic pain, which he described as a "5" out of ten, was "out of proportion to any actual x-ray findings."  (Doc. 7-13 at 11)  Dr. Richey noted Plaintiff was taking "a much higher dose of morphine than [she] would like to give," but Dr. Richey did not feel the prescription could be changed because they were "working up so many issues." (*Id.* at 12)  In addition, Dr. Richey observed that Plaintiff was "pretty devastated," "tearful and upset" because his house had recently burned down.  (*Id.* at 11)  Dr. Richey noted Plaintiff weighed 331 pounds, and was a candidate for bariatric surgery.  (*Id.* at 11-12)  Plaintiff began a pre-bariatric diet in June 2011, and continued to report pain that Dr. Richey believed was "out of proportion to any actual radiological findings."  (Doc. 7-14 at 57)

On June 23, 2011, Dr. Richey referred Plaintiff to the emergency department because he felt weak and "like passing out," and was sweaty.  (Doc. 7-14 at 112)  Upon examination, Plaintiff did not exhibit any tenderness in his neck or back, and he had a "normal range of motion" in his back.  (*Id.* at 113)  Plaintiff had an EKG, which was "unremarkable."  (*Id.* at 115)  Similarly, Plaintiff's lab results were "unremarkable with the exception of some abnormalities on his thyroid function." (*Id.*)

Dr. Ernest Wong reviewed the record and completed a case analysis on September 1, 2011. (Doc. 7-13 at 73)  Dr. Wong noted Plaintiff's activities included "daily walks, meal preparation, domestic [activities of daily living] w/o assistance, socializing, [and] animal care." (*Id.*)  He observed that Plaintiff had negative hip imaging, including a negative bone scan, and that Dr. Richey believed the pain reports were "out of proportion to findings on multiple imaging of the area." (*Id.*)  Based upon his review of the record, Dr. Wong affirmed the RFC offered by Dr. Fast. (*Id.*)

In October 2011, Plaintiff requested that Dr. Richey complete paperwork from his attorney for Plaintiff "to get Disability." (Doc. 7-14 at 47)  Dr. Richey informed Plaintiff that she would not fill out the forms, but believed her records were "sufficient." (*Id.*) Dr. Richey believed most of Plaintiff's disability was psychological and an evaluation should be obtained from a psychiatrist or psychologist. (*Id.*)

In November 2011, Plaintiff "had a Roux-en-y gastric bypass surgery," during which the physicians noticed "his liver looked abnormal." (Doc. 7-14 at 12)  A biopsy of the liver showed Plaintiff had "stage 4 cirrhosis." (*Id.*at 12, 85)  Dr. Hope Ewing explained the lab results indicated Plaintiff had "biochemically stable liver disease without evidence of other liver disease," but he was at risk for hepatocellular carcinoma and needed to begin routine cancer screening every six months. (*Id.* at 12)  She began treating Plaintiff for "Alcoholic Cirrhosis" on January 4, 2012. (*Id.* at 14)

In December 2011, Dr. Richey noted Plaintiff was "no longer seeing Dr. Savage because she felt that his behavior was threatening and she became very uncomfortable treating him after a while." (Doc. 7-14 at 43)  Dr. Richey opined that Plaintiff was in an "[e]xtremely labile emotional state, although [he] seem[ed] to have improved slightly." (*Id.* at 44)  Also, Plaintiff reported his pain level was "7 to 8" in his back and right hip. (*Id.*)  Dr. Richey noted Plaintiff "used up his pain medications too early," and that he "must take his medication exactly as prescribed and not more often." (*Id.* at 45)  Plaintiff again requested that Dr. Richey complete some paperwork "to certify his disability." (*Id.*)  However, Dr. Richey explained she "really [did] not want to sign." (*Id.*)  She noted: "It is my opinion that all of his disability is psychological and he really needs a psychologist to be managing his issues but [he] has estranged Dr. Savage." (*Id.*)

In January 2012, Plaintiff reported he was "using his TENS unit all of the time," which was not

ordered by Dr. Richey though she said she would be "happy to sign" a new order for one.  (Doc. 7-14 at 39)  Plaintiff reported his depression was "a little better."  (*Id.*)  Dr. Richey noted it was the first time she saw Plaintiff "when he did not dissolve into tears halfway through the visit."  (*Id.*)  She speculated it may be because his son was doing better and was in a recovery program, or because Plaintiff's girlfriend was at the office with him.  (*Id.*)  Dr. Richey explained Plaintiff appeared "mildly needy rather than completely pathetic as it ha[d] always been in the past."  (*Id.* at 40)  In addition, she noted Plaintiff had lost "well over 50 pounds" after his surgery, and he did not have any significant tenderness in his lumbar spine.  (*Id.*)  However, Plaintiff reported he was "not getting very good pain control any longer."  (*Id.*)  Dr. Richey noted his dosage had been decreased because she was "not continuing him on high-dose schedule 2 medications," and Plaintiff would "have to go somewhere else" if he wanted such medication.  (*Id.* at 40-41)

Dr. Ewing noted on February 13, 2012, that Plaintiff had "a MELD score of 9 which is actually quite good" because "over 15 one might consider consultation for a liver transplant."  (Doc. 7-14 at 12)  She observed that Plaintiff reported "some typical symptoms with fatigue, insomnia, edema and depression." (*Id.*)  In addition, Dr. Ewing noted Plaintiff had constant pain in his back and abdomen, which was aggravated with movement or being in a prolonged position."  (*Id.* at 16)  Dr. Ewing opined Plaintiff was able to sit for "0-1" hour and stand/walk "0-1" hour in an eight-hour day, and he needed to move around "every hour" for 5 minutes before he needed to sit again.  (*Id.* at 16-17)  Dr. Ewing indicated Plaintiff was able to lift and carry 0-10 pounds frequently and 10-20 pounds occasionally. (*Id.* at 17) She believed Plaintiff had "minimal" limitations with grasping, turning, and twisting objects; using his fingers and hands for fine manipulations; and using his arms for reaching, including overhead. (*Id.* at 17-18)  Dr. Ewing opined also that Plaintiff was "unable to cope with life stressors, depression" and was likely to be absent from work more than three times a month due to his impairments.  (*Id.* at 19-20)  Although Plaintiff's "liver function [was] preserved," Dr. Ewing believed Plaintiff would "have difficulty in a competitive work environment as his symptoms will continue to be progressive and clearly his disability will be expected to last for the rest of his life."  (*Id.* at 12-13)

On February 16, 2012, Plaintiff reported he was "having nightmares of killing babies," and wanted to "go back to Dr. Savage."  (Doc. 7-14 at 36)  Dr. Richey observed that the visit took "an

inordinate amount of [her] time" because Plaintiff was "crying almost the entire visit." (*Id.* at 38)  Dr. Richey noted she talked to Dr. Savage who indicated she was potentially willing to see him again." (*Id.* at 36)  Plaintiff reported his pain was a "5," and he showed "tenderness just at the lumbar region." (*Id.* at 37)  Plaintiff's gait was "unremarkable," and he had "[n]o gross motor or sensory deficits."  (*Id.*)

Dr. Bammann completed a "multiple impairment questionnaire" on February 22, 2012.  (Doc. 7-14 at 3-10)  Dr. Bammann noted she treated Plaintiff "annually," and he was diagnosed with (1) lumbar spinal stenosis, (2) psoriasis, (3) carpal tunnel syndrome in his left hand, (4) sleep apnea, and (5) stage 4 cirrhosis.  (*Id.* at 3)  She explained these diagnoses were supported by an MRI of Plaintiff's lumbar spine showing "multilevel stenosis" and "liver panel abnormalities."  (*Id.*)  Dr. Bammann noted Plaintiff reported having low back and right leg pain and numbness, fatigue, hot flashes, and left hand paresthesia.  (*Id.*)  She noted Plaintiff described his pain as 7 out of 10, or "moderately severe."  (*Id.* at 5)  Dr. Bammann opined Plaintiff was able to sit for "0-1" hour and stand/walk "0-1" hour in an eight-hour day.  (*Id.*)  She believed Plaintiff needed to "constantly" move around, and should not sit or stand continuously in a work setting.  (*Id.* at 5-6)  She indicated Plaintiff could occasionally lift 10-20 pounds, but never lift more than 20 pounds.  (*Id.*)  Dr. Bammann opined Plaintiff had "marked" limitations with using his arms for reaching (including overhead), and "moderate" limitations with using his fingers/hands for fine manipulations, grasping, turning, and twisting.  (*Id.* at 6-7)  According to Dr. Bammann, Plaintiff was precluded from pushing, pulling, kneeling, bending, and stooping.  (*Id.* at 9)  Also, she noted Plaintiff suffered from depression and impaired concentration, and was incapable of even "low stress."  (*Id.* at 8)  She concluded Plaintiff was permanently disabled.  (*Id.* at 3)

In March 2012, Plaintiff told Dr. Richey he was in an accident while riding a moped in Las Vegas "and took a header when he ran into [a] traffic block-up of some sort."  (Doc. 7-14 at 33)  Plaintiff reported that "he went over the handlebars," and he broke two toes.  (*Id.*)  Dr. Richey found Plaintiff was "[s]lightly tender to compression in the lumbar spine with exaggerated response," and he had "no gross motor or sensor deficit."  (*Id.* at 34)  Dr. Richey noted Plaintiff had a "[c]hronic opiate tolerance with rather excessive dosages for his documented deficits," and he seemed "to be doing a little bit better on [a] fentanyl patch."  (*Id.*)  She observed also that Plaintiff had "used a fair amount of Percocet since the injury," and declined to give him more than was required for a few days because

1   Plaintiff did "not need to medicate every ache and pain that happens to him." (*Id.* at 35)  Dr. Richey

2   noted he was "back in therapy," and was expected to work on "pain self-management." (*Id.*)

3        On March 14, 2012, Plaintiff had another MRI on his lumbar spine. (Doc. 7-14 at 23-24)  Dr.

4   Juanito Villanueva compared the MRI to the one taken in July 2010, and found "[m]oderate

5   spondylosis with mild areas of progression," including "progressive right foraminal narrowing at l4-5,

6   progressive discogenic reaction deep to the endplates at l2-3 and l4-5, and progressive right facet

7   hypertrophy at L4-5. (*Id.* at 24)  Dr. Villanueva opined "the discogenic signal changes . . . look[ed] like

8   they [were] typical in reaction to degenerative discopathy, and "the canal at L4-5 [was] low normal

9   about the same as before." (*Id.*)

10       Dr. Savage agreed to resume treating Plaintiff, and completed a "Psychiatric/ Psychological

11  Impairment Questionnaire" on April 3, 2012.[5] (Doc. 7-14 at 118-19)  She opined that Plaintiff was

12  "Cannabis Dependent;" and he suffered from morbid obesity, chronic pain disorder, a personality

13  disorder not otherwise specified. (*Id.* at 118)  Dr. Savage believed Plaintiff was likely to be absent

14  from work as a result of the impairments or treatment more than three times a month. (*Id.*)  Dr. Savage

15  noted: "[Plaintiff] states his depression is due to being morbidly obese, in chronic pain & <u>as a result</u>

16  <u>unable to get a job.</u>" (*Id.*, emphasis in original)  She believed Plaintiff's prognosis was "Good to Fair,"

17  and gave him a GAF score of 60. (*Id.* at 118)

18       In October 2012—after the ALJ issued his decision— Dr. Richey faxed a letter to Plaintiff's

19  counsel in which she wrote: "Mr. Coats has recently been diagnosed with liver cirrhosis which appears

20  to be moderately advanced. It is likely that the complications of this condition disable him from

21  pursuing full time work." (Doc. 7-14 at 121)

22  **B.     Administrative Hearing Testimony**

23       Plaintiff appeared at a hearing before the ALJ on May 23, 2012, at which time he was

24

25        [5] Plaintiff asserts, "Dr. Savage completed an eight-page Psychiatric/Psychological Impairment Questionnaire on
    April 3, 2012, of which only two pages appear in the record." (Doc. 11 at 17)  Presumably, Plaintiff believes the report was
26  eight pages long because the numbers of the questions jumps from question number 4 to 21, and the last page indicates it is
    8/8. (*See* Doc. 7-14 at 118-19)  However, there is no indication that Dr. Savage completed the remaining numbers, or that
27  the "missing" pages were provided to the ALJ by Plaintiff's counsel when he mailed the question form.  To the extent
    Plaintiff now suggests the record was incomplete, he has failed to show the ALJ had a duty to further develop the record.
    *See Mayes v. Massanari,* 276 F.3d 453, 459-60 (9th Cir. 2001) (The duty to develop the record is "triggered only when there
28  is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence").  Moreover, as
    discussed below, Plaintiff explicitly waived his assertion that he suffered from disabling mental impairments.

represented by counsel, Raymond Ugarte.  (Doc. 7-3 at 51)  Plaintiff testified that he had a twelfth-grade education, and he was able to read, write, and do simple math.  (*Id.* at 55-56)  He reported that he last worked in 2008 as a labor driver for a construction excavation company.  (*Id.* at 56)  Plaintiff said he had problems with his liver, right hip, back, right shoulder, right ankle, and possible carpal tunnel in his left hand.  (*Id.* at 56, 60)

He reported he had carpel tunnel surgery on his right hand in 2000, and bicep tendon surgery in 2001.  (Doc. 7-3 at 57) Also, Plaintiff had a gastric bypass, which he said "has helped."  (*Id.* at 62) Plaintiff said that on a scale of one to ten, with "[t]en being that the pain is so excruciating that you have to go to the emergency room in an ambulance," and "[e]ight being that you have to go to the emergency room, but you can drive yourself," his shoulder pain was a "five" on average and "seven" at the worst.  (*Id.*)  He reported the pain in his left hand was "a two," but got up to a "seven;" and his back pain was "six when it's bad," although he went to the hospital for the pain.  (*Id.* at 63)

Plaintiff testified he was "extremely active with Alcoholics Anonymous," and answered a hotline at his house Monday through Friday, from 1:00 to 4:00 p.m.  (Doc. 7-3 at 63)  He explained that he was a sponsor, and the 1-800 phone hotline was directed to his house for those three hours a day.  (*Id.* at 63-64)  Plaintiff believed talking to others helped him maintain his sobriety.  (*Id.* at 64)  He said he spent the remainder of each day watching television and attending AA meetings.  (*Id.* at 65)

He said he was able to bathe and dress himself, although he had difficulty putting on socks sometimes.  (Doc. 7-3 at 64)  In addition, Plaintiff stated he had difficulty with grasping and holding items, such as a gallon of milk.  (*Id.* at 65-66)  He explained he had "no lateral strength in [his] shoulder whatsoever because of the Rotator Cuff."  (*Id.* at 66)  He estimated he was able to "sit in the same place without moving at all" for about twenty minutes in a straight-back chair.  (*Id.* at 70) Plaintiff explained he elevated his legs every day by sitting on a recliner or placing a pillow under his knees.  (*Id.* at 67)  He estimated he had twenty "bad days" per month, when he was not "able to move."  (*Id.* at 68)  Also, Plaintiff said he suffered from nausea caused by "liver issues."  (*Id.* at 69)

Plaintiff testified he was a candidate for both back surgery and shoulder surgery.  (Doc. 7-3 at 69)  He also reported he was "in line for a [liver] transplant."  (*Id.* at 71-72)  Plaintiff then clarified that he was not on a transplant list yet because "[his] liver hasn't gotten bad enough; it hasn't shrunken

1  small enough yet." (*Id.* at 72)  He believed he was going to be placed on the transplant list about six

2  months after the hearing.  (*Id.*)

3       Vocational expert Christopher Salvo ("VE") testified after Plaintiff at the hearing.  (Doc. 7-3 at

4  74)  The VE classified Plaintiff's past relevant work as a construction laborer, *DOT* 869.684-014.[6]  (*Id.*)

5  The VE explained that it was "a semi-skilled occupation… and heavy in regard to the physical

6  demands."  (*Id.* at 74-75)  However, the VE determined Plaintiff performed the work "as very heavy."

7  (*Id.* at 75)  In addition, the VE noted Plaintiff had past work as an operating engineer, *DOT* 859.683-

8  010, which as a "skilled occupation . . . and medium in nature."  (*Id.*)

9       The ALJ asked the VE to consider a hypothetical individual "of the claimant's age, education,

10  and work experience [who] was able to do light work, with no climbing of ladders, ropes or scaffolds,

11  occasional climbing of ramps or stairs, occasional stooping, crouching, kneeling and crawling."  (Doc.

12  7-3 at 75-76)  Also, the individual was required to "avoid [the] use of hazardous machinery, and all

13  exposure to unprotected heights."  (*Id.* at 76)  The ALJ limited the individual to simple and repetitive

14  tasks, "as defined in the *DOT* as SVP levels one and two,"[7] that had "no strict production quota, with an

15  emphasis on a per shift, rather than a per hour basis."  (*Id.*)  The VE opined such a person was not able

16  to perform Plaintiff's past relevant work, but was able to perform other work in the local region or

17  national economy, including small products assembler, *DOT* 706.684-022; production assembler, *DOT*

18  706.687-010; and barker, *DOT* 342-657-010.  (*Id.* at 76-77)

19       Next, the ALJ added the limitation to "frequent handing and fingering with the upper left

20  extremity."  (Doc. 7-3 at 77)  The VE opined the "hypothetical person could perform those duties of the

21  … jobs that [he] mentioned."  (*Id.*)  However, if the person was limited "to occasional fingering,

22  handling with the left upper extremity," the VE opined both of the assembly jobs would be eliminated

23  because they required "using both hands on more than an occasional basis."  (*Id.*)  However, the person

24  could still work as a barker, and there were "at least 3,000 positions in California, and at least 16,000

---

[6] *The Dictionary of Occupational Titles* ("DOT") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon to evaluate "whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990), and may be a primary source of information for the ALJ.  20 C.F.R. § 404.1566(d)(1).

[7] "SVP," or specific vocational preparation, is defined as the amount of lapsed time required by a typical worker to learn techniques and acquire information needed for average performance in a specific job position. *DOT*, page 1009.

1   throughout the United States." (*Id.*)

2       Third, Plaintiff's counsel asked the VE to consider the limitations given initially, and that "the

3   hypothetical individual needs to get up and move around every hour for five minutes away from the

4   work station, or the work area." (Doc. 7-3 at 79)  The VE opined such a limitation would preclude the

5   person from Plaintiff's past relevant work. (*Id.*)

6       The VE agreed that if Plaintiff was restricted to the sedentary level of work, "he would grid out,

7   given his age at the current time." (Doc. 7-3 at 78)

8   **C.     The ALJ's Findings**

9       Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial

10  activity after the alleged onset date of May 10, 2009. (Doc. 7-3 at 27)  Second, the ALJ found Plaintiff

11  "has the following severe impairments: disorder of the back; degenerative joint disease of the right

12  shoulder; degenerative joint disease of the right ankle; alcoholic cirrhosis; history of alcohol abuse; and

13  major depressive disorder." (*Id.*)  These impairments did not meet or medically equal a listed

14  impairment. (*Id.* at 19)  Next, the ALJ determined:

15      [Plaintiff] has the residual functional capacity to perform a range of light work as
        defined in 20 CFR 404.1567(b) and SSR 83-10 specifically as follows: the claimant can
16      lift and/or carry 20 pounds occasionally and 10 pounds frequently; he can stand and/or
        walk for six hours out of an eight-hour workday with regular breaks; he can sit for six
17      hours out of an eight-hour workday with regular breaks; he is precluded from climbing
        ladders, ropes and scaffolds[;] he can occasionally climb ramps or stairs; he can
18      occasionally stoop, crouch, kneel, and crawl; he is precluded from using hazardous
        machinery; he is precluded from all exposure to unprotected heights; due to pain and
19      side effects of medication[;]the claimant is limited to performing simple, as defined in
        the DOT as SVP levels 1 and 2, routine, repetitive tasks at jobs; he is precluded from
20      performing work that has strict production quotas, with an emphasis on a per shift
        rather than a per hour basis; and he can frequently perform handling and fingering with
21      the left upper extremity.

22  (*Id.* at 29)  With this residual functional capacity ("RFC"), the ALJ found Plaintiff was able to perform

23  "jobs that exist in significant numbers in the national economy," including small products assembler,

24  production assembler, and barker. (*Id.* at 41)  Thus, the ALJ concluded Plaintiff was not disabled as

25  defined by the Social Security Act. (*Id.* at 41-42)

26                        **DISCUSSION AND ANALYSIS**

27      Plaintiff argues that the ALJ erred in assessing the mental function assessments of Drs. Savage

28  and Martin, and by giving "little or no weight" to the physical function assessments of his treating

                                         20

1 physicians, Drs. Bammann and Ewing." (Doc. 11 at 20, 24, emphasis omitted)  In addition, Plaintiff

2 asserts the ALJ failed to properly evaluate the credibility of his subjective complaints.  (*Id.* at 26-29)

3 On the other hand, Defendant contends the ALJ's decision was "supported by substantial evidence,

4 free from legal error, and should be affirmed."  (Doc. 14 at 29)

5 **A.      The ALJ's Credibility Determination**

6         When evaluating a claimant's credibility, an ALJ must determine first whether objective

7 medical evidence shows an underlying impairment "which could reasonably be expected to produce the

8 pain or other symptoms alleged."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)

9 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)).  Next, if there is no evidence of

10 malingering, the ALJ must make specific findings as to the claimant's credibility.  *Id.* at 1036.  In this

11 case, the ALJ determined Plaintiff's "medically determinable impairments could reasonably be

12 expected to cause some of the alleged symptoms."  (Doc. 7-3 at 32)  However, the ALJ found his

13 "allegations concerning the intensity, persistence and limiting effects of his symptoms are less than

14 fully credible."  (*Id.* at 31)

15         An adverse credibility determination must be based on clear and convincing evidence where

16 there is no affirmative evidence of a claimant's malingering and "the record includes objective medical

17 evidence establishing that the claimant suffers from an impairment that could reasonably produce the

18 symptoms of which he complains."  *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160

19 (9th Cir. 2008).  Factors that may be considered include, but are not limited to: (1) the claimant's

20 reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct; (3) the

21 claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or

22 follow a prescribed course of treatment and (5) testimony from physicians concerning the nature,

23 severity, and effect of the symptoms of which the claimant complains.  *Fair v. Bowen*, 885 F.2d 597,

24 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).  To support a

25 credibility determination, the ALJ "must identify what testimony is not credible and what evidence

26 undermines the claimant's complaints."  *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996).

27         Here, the ALJ considered Plaintiff's daily activities, his failure to comply with treatment, the

28 objective evidence, Plaintiff's criminal history, and his ability to take a vacation.  (Doc. 7-3 at 30-31)

The Ninth Circuit has determined these are relevant factors in assessing the credibility of a claimant. *See, e.g., Fair*, 885 F.2d at 603; *Thomas*, 278 F.3d at 958-59.  However, Plaintiff argues the ALJ's credibility analysis was flawed, and that the reasons articulated by the ALJ do not "truly undermine[] his veracity."  (Doc. 11 at 27)

### 1.      Plaintiff's activities

When a claimant spends a substantial part of the day "engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations."  *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (citing *Fair*, 885 F.2d at 603).  For example, a claimant's ability to cook, clean, do laundry and manage finances may be sufficient to support an adverse credibility determination.  *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008).  Similarly, an ALJ may conclude "the severity of . . . limitations were exaggerated" when a claimant exercises, gardens, and participates in community activities.  *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009).

In *Burch v. Barnhart*, the ALJ explained the claimant's daily activities "suggest that she is quite functional. She is able to care for her own personal needs, cook, clean and shop." *Id.*, 400 F.3d 676, 680 (9th Cir. 2005).  Likewise, here, the ALJ noted that Plaintiff testified he lived alone was able to attend his personal care and was "able to drive, prepare food, perform household chores, walk, shop, care for a dog, and attend Alcoholics Anonymous meetings." (Doc. 7-3 at 29, 30)  In addition, Plaintiff reported he was "a sponsor for Alcoholics Anonymous," and talked on the telephone daily.  (*Id.* at 30)  The ALJ found these activities showed that, "despite his impairment, [Plaintiff] has engaged in a somewhat normal level of daily activity and interaction." (*Id.* at 31)  Further, the ALJ observed, "The physical and mental capabilities requisite to performing many of the tasks described above as well as the social interactions replicate those necessary for obtaining and maintaining employment." (*Id.*)  As the Ninth Circuit explained in *Burch*, "Although the evidence of [the plaintiff's] daily activities may also admit of an interpretation more favorable to [him], the ALJ's interpretation was rational, and [the court] 'must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.'" *Burch*, 400 F.3d at 680 (quoting *Magallanes*, 881 F.2d at 750).  Thus, Plaintiff's daily activities support

22

the adverse credibility determination.

### 2.        Failure to comply with treatment

The Regulations caution claimants that "[i]n order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work." 20 C.F.R. §§ 404.1530(a), 416.930(a).  If a claimant fails to follow the prescribed treatment without an acceptable reason, the Commissioner "will not find [the claimant] disabled." 20 C.F.R. §§ 404.1530(b), 416.930(b).  Accordingly, the Ninth Circuit determined, "[A]n unexplained, or inadequately explained, failure to . . . follow a prescribed course of treatment . . . can cast doubt on the sincerity of the claimant's pain testimony. *Fair*, 885 F.2d at 603.  Therefore, noncompliance with a prescribed course of treatment is clear and convincing reason for finding a plaintiff's subjective complaints lack credibility. *Id.; see also Bunnell*, 947 F.2d at 346.

Here, the ALJ found there was "evidence that the claimant has not been entirely compliant in taking prescribed medications." (Doc. 7-3 at 31)  For example, the ALJ noted Plaintiff "admitted he forgot to take his psychiatric medications and he admitted that his condition would likely improve if he took his medications as prescribed." (*Id.*, citing Doc. 7-10 at 53)  The ALJ found, "The claimant's noncompliance with his psychiatric medications suggests that the symptoms may not have been as limiting as the claimant has alleged in connection with this application." (*Id.*)  Further, the ALJ found Plaintiff's failure to comply with treatment "demonstrates a possible unwillingness to do that which is necessary to improve his condition." (*Id.*)

Plaintiff contends the ALJ erred in considering his failure to comply with treatment because "the very notes he cited reflect not an unwillingness to take his medication but a mere forgetting to do so." (Doc. 11 at 28)  However, the Regulations identify the "[a]cceptable reasons for failure to follow prescribed treatment," including:

(1) The specific medical treatment is contrary to the established teaching and tenets of your religion.

(2) The prescribed treatment would be cataract surgery for one eye when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment.

(3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment.

23

(4) The treatment because of its enormity (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5) The treatment involves amputation of an extremity, or a major part of an extremity.

20 C.F.R. §§ 404.1530(c), 416.930(c).  Thus, that a claimant forgets to take his medication is not an accepted reason excusing the failure to follow prescribed treatment.  *See id.*

Accordingly, this Court determined that the fact that a claimant "forgot" to take his medication is not sufficient to counter an adverse credibility determination that is based in part upon the failure to comply with treatment.  *See Craven v. Comm'r of Soc. Sec.*, 2015 WL 4620551 at*8 (E.D. Cal. July 31, 2015).  In *Craven*, the claimant admitted "he did not always use his insulin medication as prescribed because he 'forgets to take his afternoon dose…'"  *Id.*  The Court found the ALJ did not err in finding Craven failed to follow his prescribed treatment, because the fact that he forgot to take his medication was "insufficient" to invalidate the ALJ's conclusion that Craven was not complying with his treatment.  *Id.*  Similarly, here, the fact that Plaintiff did not take his medication—because he forgot—is a proper basis to support the ALJ's reasoning.[8]  Thus, the ALJ's conclusion that Plaintiff had a history of not complying with treatment was supported by the medical record, and a clear and convincing reason for rejecting Plaintiff's testimony.

### 3.   Inconsistencies with the medical record

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility."  *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).  The Ninth Circuit explained, "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a

---

[8] Notably, *Craven* the Court found "the record contains a number of other treating records indicating [the] plaintiff's non-compliance with his prescribed treatments beyond those the ALJ cited in support" of his conclusion that the plaintiff "failed to fully comply with the treatments his treating physicians prescribed."  *Craven*, 2015 WL 4620551 at *8.  Likewise, here, there are several indications in the record that Plaintiff was not complying with the recommendations of his physicians and his treatment plan.  For example, although Drs. Borgquist and Pollard told Plaintiff to stop smoking marijuana (*see* Doc. 7-9 at 9; Doc. 10 at 24), Plaintiff continued using marijuana (*see* Doc. 7-10 at 52; Doc. 7-14 at 118).  In addition, in March 2011, Plaintiff failed to have testing done that was ordered by Dr. Richey, including a "serum protein electrophoresis with urine immunophoresis studies" and "an ultrasound of his abdomen to rule out liver disease."  (Doc. 7-13 at 18)

relevant factor in determining the severity of the claimant's pain and its disabling effects."  *Rollins*, 261 F.3d at 857; *see also Burch*, 400 F.3d at 681 ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis"). Because the ALJ did not base the decision solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff, the objective medical evidence was a relevant factor in determining Plaintiff's credibility.

However, if an ALJ cites the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to make a simple statement that the testimony is contradicted by the record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination").  Rather, an ALJ must "specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ "must state which . . . testimony is not credible and what evidence suggests the complaints are not credible").  Here, the ALJ found the medical record conflicted with Plaintiff's testimony "concerning his symptoms and limitations was exaggerated and inconsistent with the totality of the objective evidence."  (Doc. 7-3 at 31)  The ALJ observed that "on numerous occasions in the record, the claimant's physicians reported the claimant's description of his symptoms and allegations of pain were unusual and inconsistent with the objective medical evidence."  (*Id.*)

Specifically, the ALJ observed that "at the claimant's most recent appointment in March 2012, his primary care physician noted that the claimant's chronic subjective low back pain and right hip pain was without significant underlying documented pathology."  (Doc. 7-3 at 31, citing Doc. 7-14 at 34) The ALJ noted Dr. Richey opined also that "none of [Plaintiff's] impairments  . . . were significant enough to cause the extreme pain complaints the claimant has asserted."  (*Id.*)  Specifically, in the treatment records cited by the ALJ, Dr. Richey found:

> Chronic subjective low back and right hip pain without significant underlying documented pathology.  He had minimal L5-S1 neural foraminal stenosis and minimal T12 to L1, L4-5, L3-4 and L5-S1 acquired central canal stenosis on MRI done in 2010. There was no evidence of focal disk protrusion.  There was no definite core impingement except possibly a little bit at T12-L1.  None of this was felt to be significant enough to cause his extreme pain complaints.  He also has a history of a gluteus medius muscle strain bilaterally without any arthritic changes of the right hip or any acetabular labral

tear and no evidence of iliopsoas bursitis or pelvic abscess.  His complaint of hip pain has been unexplained.

(Doc. 7-14 at 34)  Accordingly, the ALJ concluded "the discrepancy between the claimant's testimony and the objective medical evidence diminishes the persuasiveness of the claimant's subjective complaints and the alleged functional limitations."  (Doc. 7-3 at 31)

The fact that the objective medical record did not support Plaintiff's subjective complaints was a valid consideration by the ALJ.  As the Ninth Circuit explained, an ALJ may consider "contradictions between claimant's testimony and the relevant medical evidence."  *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)  Because the ALJ sufficiently identified medical evidence—including findings of Plaintiff's treating physician—that undermined the credibility of Plaintiff's complaints, the objective medical record supports the adverse credibility determination.  *See Greger*, 464 F.3d at 972; *Dodrill*, 12 F.3d at 918.

### 4.    Plaintiff's criminal history

The ALJ noted Plaintiff had been "convicted and incarcerated for committing a crime of moral turpitude, lewd acts on a minor."  (Doc. 7-3 at 31)  Plaintiff does not dispute that this was a crime of moral turpitude, but argues the ALJ erred in considering this as part of the credibility determination because: "[w]hile any crime against a minor is undoubtedly reprehensible, it does not necessarily follow that it involves dishonesty."  (Doc. 11 at 29)  Plaintiff contends he was "quite forthright in admitting that difficult fact to his psychologist, and the record contains no evidence of inconsistent statements or other forms of dishonesty."[9]  (*Id.*)

Significantly, however, an ALJ may rely upon a claimant's convictions for crimes of moral turpitude as part of a credibility determination.  *Albidrez v. Astrue*, 504 F.Supp.2d 814, 822 (C.D. Cal 2007) ("convictions involving moral turpitude . . . are a proper basis for an adverse credibility determination"); *see also Hardisty v. Astrue,* 592 F.3d 1072, 1080 (9th Cir. 2010) (in ruling on an Equal Access to Justice Act request, the Court determined the ALJ's credibility determination was substantially justified when it was based, among other factors, on the claimant's prior criminal

---

[9] Notably, though Plaintiff admitted he paid two minor to perform a sex act at a party, he also told Dr. Kalman that the "charges were not justified." (Doc. 7-8 at 15)

26

1   convictions); *see also Richey v. Colvin*, 2013 WL 5228185 at *20 (N.D. Cal. Sept. 17, 2013) ("[i]n

2   finding a claimant's testimony not credible, an ALJ may rely on convictions for crimes of moral

3   turpitude"); *Farmer v. Colvin,* 2014 WL 3818510 at *16 (D.Ariz. Aug. 4, 2014) ("[c]onsideration of

4   evidence of prior incarceration, particularly for a crime of moral turpitude, is not error, and may

5   constitute clear and convincing reasons for discounting a social security claimant's testimony").

6   Therefore, the ALJ did not err in finding Plaintiff's criminal history made his "credibility highly

7   suspect," and this factor supports the adverse credibility determination.

8        **5.**      **Plaintiff's ability to take a vacation**

9        The ALJ observed, "Although a vacation and a disability are not necessarily mutually exclusive,

10   the claimant's decision to go on a vacation [to Las Vegas, Nevada] and ride on a moped while on

11   vacation tends to suggest that the alleged symptoms and limitations may have been overstated." (Doc.

12   7-3 at 31) Plaintiff contends the ALJ erred in considering Plaintiff's ability to take a vacation or ride a

13   moped as part of the credibility determination, because "[t] The ALJ never specifically set forth how he

14   believes that moped ride contradicts Mr. Coats' claim of being unable to perform the prolonged sitting,

15   standing, walking, lifting, or carrying entailed in full-time work." (Doc. 11 at 29)

16        On the other hand, Plaintiff's ability to travel to Las Vegas for a vacation does undermine his

17   testimony that he was only "able to sit for up to 20 minutes." (*See* Doc. 7-3 at 30, 31)  For example,

18   this Court found an ALJ properly considered a claimant's ability to take a vacation as part of the

19   credibility determination where the claimant claimed "she could not sit for an hour-and-a-half," yet

20   "she flew for five-and-a-half hours to go on vacation in Jamaica." *Leon v. Astrue*, 830 F. Supp. 2d 844,

21   846 (E.D. Cal. 2011) (citing *Tommasetti*, 533 F.3d at 1040 (holding the ALJ properly inferred from the

22   claimant's ability to travel to Venezuela that he was not as physically limited as he alleged)).

23        However, even if the ALJ erred by not specifically explaining how the ability to vacation is

24   inconsistent with Plaintiff's allegations, as Plaintiff argues, such error was harmless.  The ALJ met his

25   burden to identify several clear and convincing reasons supporting the adverse credibility

26   determination, which were "sufficiently specific to allow a reviewing court to conclude the ALJ

27   rejected the claimant's testimony on permissible grounds." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th

28   Cir. 2004); *see also Thomas*, 278 F.3d at 958.  As such, the reliance upon one invalid reason is a

harmless, because the error "does not negate the validity of the ALJ's ultimate credibility conclusion." *Carmickle* , 533 F.3d at 1160 (quoting *Batson v. Comm'r of Soc. Sec. Admin*, 359 F.3d 1190, 1197 (9th Cir. 2004).

## B.      The ALJ's Evaluation of the Medical Record

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).  In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability.  *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  Further, an examining physician's opinion is given more weight than the opinion of non-examining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

A physician's opinion is not binding upon the ALJ, and may be discounted whether another physician contradicts the opinion.  *Magallanes*, 881 F.2d at 751.  An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and convincing" reasons.  *Lester*, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Lester*, 81 F.3d at 830. When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict."  *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).  The ALJ's resolution of the conflict must be upheld by the Court when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

### 1.      Plaintiff's mental limitations

As an initial matter, Plaintiff asserts the ALJ erred in evaluating the medical record related to his mental impairments.  However, at the administrative hearing, Plaintiff's counsel, Mr. Ugarte, told the ALJ that Plaintiff was "seeking to waive the psychological aspect of his case," and his "focus [was]

strictly on physical [impairments]." (Doc. 7-3 at 56)  Mr. Ugarte explained:  "There is a problem with

his treating physician, his psychological treating physician. … There's a problem with his treating

doctor's opinion, and he's seeking alternative psychiatric treatment. And as a result, he is going to –

he's going to waive the psychological aspect and simply focus on the physical matter.  (*Id.* at 56-57)

Thus, the Court finds Plaintiff explicitly waived any argument that he suffered from disabling mental

impairments at the administrative hearing. *See Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999)

(holding that "at least when claimants are represented by counsel, they must raise all issues and

evidence at their administrative hearings in order to preserve them on appeal").  Nevertheless, even if

Plaintiff had not waived his alleged mental limitations, the ALJ supported his decision related to the

weight given to the opinions of Drs. Martin and Savage.

>           a.        Opinion of Dr. Savage

The ALJ rejected the opinion of Plaintiff's treating physician, Dr. Galyn Savage.  (Doc. 7-3 at

37)  The ALJ found the opinion "appears to rely quite heavily upon the claimant's subjective

allegations." (*Id.*)  In addition, the ALJ found Dr. Savage's opinion was "not supported by the doctor's

clinical and diagnostic findings." (*Id.*)  Further, the ALJ observed that Plaintiff was "able to engage in

numerous activities of daily living, despite his psychological impairments, which shows he has greater

abilities than those assessed by Dr. Savage." (*Id.*)

The Ninth Circuit has determined the opinion of a treating physician may be rejected for each of

the reasons articulated by the ALJ.  *See, e.g., Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir.

2008) (an ALJ may reject an opinion predicated upon "a claimant's self-reports that have been properly

discounted as not credible"); *Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986) (a physician's

opinion may be rejected "if brief and conclusory in form with little in the way of clinical findings to

support [its] conclusion"); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (holding an ALJ

may reject an opinion when the physician sets forth restrictions that "appear to be inconsistent with the

level of activity that [the claimant] engaged in").

As the ALJ noted, Dr. Savage indicated Plaintiff was likely to be absent from work more than

three times a month, but did not identify any "clinical and diagnostic findings" to support the opinion.

(Doc. 7-3 at 38; *see also* Doc. 7-14 at 119)  Rather, Dr. Savage noted only: "*Plaintiff states* his

depression is due to being morbidly obese, in chronic pain & as a result unable to get a job."  (Doc. 7-14 at 119, emphasis added)  Thus, it appears that Dr. Savage relied upon Plaintiff's subjective complaints when concluding Plaintiff would miss work more than three days a month.  As discussed above, the ALJ set forth clear and convincing reasons to find Plaintiff lacked credibility concerning the extent of his subjective complaints.  Consequently, these were specific and legitimate reasons for rejecting the opinion of Dr. Savage.

Further, the ALJ found Plaintiff's daily activities were "numerous," and conflicted with the opinion that Plaintiff would miss work more than three times each month.  (Doc. 7-3 at 37)  Although Plaintiff asserts "the ALJ does not identify [his] 'activities of daily living'" (Doc. 11 at 24), the ALJ discussed Plaintiff's activities extensively.  The ALJ noted Plaintiff was "able to drive, prepare food, perform household chores, walk, shop, care for a dog, and attend Alcoholics Anonymous meetings." (Doc. 7-3 at 29)  The ALJ observed also that Plaintiff talked on the telephone daily as a sponsor for Alcoholics Anonymous.  (*Id.* at 29, 30)  Indeed, Plaintiff testified he managed an Alcoholics Anonymous hotline number for three hours each weekday, and he tried to attend "a meeting every day, they have a meeting."  (*See id.* at 63-65)  This level of activity suggests Plaintiff is able to maintain a schedule and, as the ALJ found, is inconsistent with Dr. Savage's opinion that Plaintiff's mental impairments could preclude him from work more than three times a month.  Accordingly, the ALJ set forth legally sufficient reasons for rejecting the opinion of Dr. Savage.  *See Rollins*, 261 F.3d at 856; *see also Fisher v. Astrue*, 429 Fed. App'x 649, 652 (9th Cir. 2011) (the ALJ set forth specific and legitimate reasons for rejecting a physician's opinion where the assessment was based upon the claimant's subjective complaints, and limitations identified by the doctor conflicted with the claimant's daily activities).

### b.    Opinion of Dr. Martin

The ALJ found the opinion of examining physician Dr. Martin was "generally consistent with the objective evidence of record including treatment notes from the claimant's treating practitioners." (Doc. 7-3 at 39)  Specifically, the ALJ observed:

> Dr. Martin opined the claimant would have moderate difficulty sustaining his attention and concentration, and cognitive effort due to pain and depression.  [Citation]  Dr. Martin also stated the claimant had no difficulty understanding, remembering, and carrying out

30

> simple, detailed or complex instructions [Citation].  Dr. Martin stated the claimant had severe difficulty with pace and persistence; and he opined the claimant would have severe difficulty adapting to changes in routine work-related settings [Citation].  Finally, Dr. Martin opined the claimant had moderate impairment in his ability to interact with the public, supervisors and coworkers [Citation].

(*Id.* at 38-39)  The ALJ explained he gave "significant weight" to the opinion of Dr. Martin in limiting Plaintiff "to performing simple repetitive tasks, due to pain, medication side effects, and concentration problems."  (*Id.* at 39)  In addition, the ALJ noted he "included a limitation that precluded the claimant from performing work that required fast-paced production or quotas" "in light of Dr. Martin's findings from the mental status examination that the claimant did not respond well to stress and … had difficulty maintaining a constant pace."  (*Id.*)

Plaintiff asserts the ALJ "ultimately credited only a selected aspect of Dr. Martin's overall assessment," and failed to address Dr. Martin's opinions that Plaintiff "would have difficulty sustaining attention, concentration, and cognitive effort generally; severe difficulty with pace and persistence; severe difficulty enduring stress even of the clinical interview; severe difficulty adapting to changes in routine work-related settings; and moderate impairments in his ability 'to interact with the public, supervisors, and coworkers.'"  (Doc. 11 at 21)  Plaintiff argues:

> Several courts have held that moderate limitations in attention and concentration are not necessarily accommodated by unskilled work. *See, e.g., Newton v. Chater*, 92 F.3d 688 (8th Cir. 1996) ("unskilled sedentary work" is insufficient to describe and accommodate concentration deficiencies); *McGuire v. Apfel*, 1999 WL 426035, at *15 (D. Ore. 1999) (same); *Keyser v. Barnhart*, No. 03-60078 (E.D. Mich. 2004) (unpublished) ("unskilled jobs with a low stress level" not alone sufficient to accommodate a claimant with "moderate limitations with respect to concentration, persistence or pace"); *Edwards v. Barnhart*, 2005 WL 2038210 *9 (E.D. Mich. 2005) (same). Likewise, an inhibited ability to handle the stresses of the workplace is not presumptively accommodated by simple work. *See, e.g., Kusilek v. Barnhart*, 2005 WL 567816 *5 (W.D. Wis. 2005) ("I agree with the magistrate judge that "low stress routine work" is not exactly the same as "unskilled or simple, semiskilled work"). Additionally, the inability to deal with routine changes in the work setting and an inability to interact appropriately with others are similarly unaddressed by the limitation to simple work with no strict production quotas.

(Doc. 11 at 22)  Therefore, Plaintiff concludes the opinion of Dr. Martin was "given very little weight at all, and with no rationale for the division."  (*Id.*)

As an initial matter, Plaintiff mischaracterizes the assessment of Dr. Martin, who did not opine Plaintiff would have difficulty with difficulty with pace and persistence, but rather *observed* that during the evaluation, Plaintiff "demonstrated difficulty with pace and persistence" and "had severe difficulty

enduring the stress of the interview." (Doc. 7-10 at 57)  In fact, Dr. Martin offered very few findings regarding Plaintiff's limitations and abilities to work, although he concluded that Plaintiff "would have difficulty sustaining his attention and concentration and cognitive effort secondary to his depression and chronic pain." (*Id.*)  However, Dr. Martin gave Plaintiff a GAF score of 55 (*id.* at 56), thereby indicating Plaintiff had "*moderate* symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR *moderate* difficulty in social, occupational, or school functioning." (*DSM-IV* at 34, emphasis added) Drs. Ikawa and Bradley reviewed the record—including Dr. Martin's findings from the consultative examination—and determined that, despite moderate difficulties with concentration, pace, and persistence, Plaintiff was "[a]ble to sustain simple and repetitive tasks" and "sustain work effort at unskilled tasks." (Doc. 7-12 at 4; Doc. 7-13 at 74)  Similarly, Dr. Paxon reviewed the record and found Plaintiff had no more than moderate mental limitations, and was able to "respond appropriately to change" in the work setting.[10] (Doc. 7-8 at 17-18)

Moreover, the Ninth Circuit has determined the limitation to unskilled work adequately encompasses a claimant's "moderate mental residual functional capacity limitations" and "marked limitation in [an] ability to maintain concentration over extended periods. *See, e.g., Thomas v. Barnhart*, 278 F.3d 947, 953, 955 (9th Cir. 2002).  Similarly, the Court concluded the limitation to "simple, routine, repetitive" accommodated the examining and reviewing physicians' findings that the claimant had a "slow pace" and "several moderate limitations in other mental areas." *Stubbs-Danielson v. Astrue*, 539 F.3d 1169 (9th Cir. 2008); *see also Sabin v. Astrue*, 337 Fed. App'x. 617, 620-21 (9th Cir. 2009) (finding the ALJ properly assessed medical evidence when finding that—despite moderate difficulties as to concentration, persistence, or pace—the claimant could perform simple and repetitive tasks on a consistent basis).

Courts within the Ninth Circuit have also concluded that a claimant's low tolerance of stress is encompassed in a limitation "to simple, repetitive tasks" and work "that does not require meeting fast-

---

[10] Significantly, as explained by the Ninth Circuit, the opinions of non-examining physicians "may constitute substantial evidence when it is consistent with other independent evidence in the record." *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).  Because their opinions are consistent with the opinion of Dr. Kalman that Plaintiff was "psychiatrically able to withstand stress and pressures associated with daily work activities" (Doc. 7-8 at 16), the opinions of Drs. Ikawa, Bradley, and Paxton, are substantial evidence supporting the residual functional capacity assessment.

paced quotas." *See, e.g., Keller v. Colvin,* 2014 WL 130493 at *3 (E.D. Cal. Jan. 13, 2014) (finding the ALJ "appropriately captured" a physician's opinion that the plaintiff required "low stress settings" by "limiting [the] plaintiff to simple, repetitive tasks equating to unskilled work); *Suiter v. Colvin,* 2014 WL 1659279 at *19 (C.D. Cal. Apr. 25, 2014) (finding the limitation to "work of a repetitive (i.e., simple) nature that does not require meeting fast-paced quotas (i.e. low-stress)" reflected the doctor's opinion that the claimant's anxiety and depression "could interfere with his ability to deal with ordinary work stresses); *see also Vezina v. Barnhart,* 70 Fed. App'x. 932 (9th Cir. 2003) (in response to a hypothetical restricting the claimant to low-stress work, the vocational expert listed jobs involving "simple, repetitive, relatively unskilled tasks").

Finally, the ALJ rejected Dr. Martin's conclusion that Plaintiff had a "moderate impairment in his ability to interact with the public, supervisors and coworkers" and "severe difficulty adapting to changes in routine work-related settings," finding instead Plaintiff was not as limited as the physician concluded.  (*See* Doc. 7-3 at 39)  The ALJ observed that another consultative examiner, Dr. Kalman, "opined the claimant was able to relate to supervisors and coworkers [and] he is able to deal with the public."  (*Id.*)  In addition, Dr. Kalman found Plaintiff was "psychiatrically able to withstand stress and pressures associated with daily work activities."[11]  (*Id.*; *see also* Doc. 7-9 at 16)  Further, ALJ noted the "longitudinal evidence" showed Plaintiff's mental impairment and mood improved with treatment, and Plaintiff "continued to engage in numerous activities of daily living despite his impairment."  (*Id.*)  Consequently, the ALJ met his burden to identify specific and legitimate reasons to find Plaintiff's limitations with adaptation were not severe, as opined by Dr. Martin.  *See Rollins,* 261 F.3d at 856; *Mendoza v. Astrue,* 371 Fed. Appx. 829, 831-32 (9th Cir. 2010) (explaining the opinion of a physician may be rejected where it is "unsupported by the record as a whole").[12]

---

[11] Significantly, under the Regulations, basic work activities include "[r]esponding appropriately to supervision, co-workers and usual work situations;" and "[d]ealing with changes in a routine work setting." 20 C.F.R. §§ 404.1521(a), 416.921(a).

[12] To the extent Plaintiff even had "moderate" difficulties with difficulties with social functioning and adaptation, the limitation to simple, repetitive and routine tasks incorporated these limitations.  *See, e.g., Koehler v. Astrue,* 283 Fed. Appx. 443, 445 (9th Cir. 2008) (ALJ's finding that claimant lacked a "severe" mental impairment was proper even though claimant had "moderate" limitation in the "ability to respond to changes in the workplace setting"); *Diakogiannis v. Astrue,* 975 F. Supp. 2d 299, 312 (W.D.N.Y. 2013) (finding the ALJ adequate accounted for "significantly delayed adaptive behavior . . . in finding that [the claimant] could perform 'simple, routine, and repetitive tasks'")  As one district court

c.      Conclusion

For the foregoing reasons, the Court finds Plaintiff waived his assertion that he suffered from a disabling mental impairment at the hearing.  *See Meanel*, 172 F.3d at 1115; *Andrade v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 29120 (E.D. Cal. (finding that where the claimant was represented by counsel and failed to raise an issue at the administrative hearing, it was not preserved for appeal); *Howard v. Colvin*, 2013 U.S. Dist. LEXIS 56072 at *12 (E.D. Wash. Apr. 18, 2013) (where the claimant "explicitly waived the issue [of his physical impairments] at the administrative hearing," he was unable challenge the ALJ's findings related to his physical impairments on appeal).

However, even if the issue was not waived, the ALJ set forth legally sufficient reasons for rejecting the opinion of Dr. Savage, and the residual functional capacity assessment incorporates the moderate mental limitations that the ALJ found supported in Dr. Martin's opinion.  Thus, the ALJ did not err in finding Plaintiff has the mental ability to perform "simple, as defined in the DOT as SVP levels 1 and 2, routine, repetitive tasks at jobs" that did not have "strict production quotas, with an emphasis on a per shift rather than a per hour basis."  (*See* Doc. 7-3 at 29)

### 2.      Plaintiff's physical limitations

Plaintiff contends, "The ALJ committed harmful legal error in granting little or no weight to the physical function assessments of treating physicians Bammann and Ewing[13]." (Doc. 11 at 24, emphasis omitted)  According to Plaintiff, "In finding that Mr. Coats' musculoskeletal impairments of his back, right shoulder, and right ankle as well as his liver cirrhosis only limit him to the performance of a reduced range of light work, the ALJ rejected the more restrictive assessments of treating physiatrist Bammann and family practitioner Ewing."  (*Id.*)  Plaintiff argues, "All of the ALJ's criticisms of the physical function assessments of both Dr. Bammann and Dr. Ewing—which he leveled jointly at both doctors' assessments—take the form of general, almost boilerplate language that one must strain to

---

explained, such limitations with adaptation are not *per se* disabling, nor do they preclude the performance of jobs that involve simple, repetitive tasks."  *McLain v. Astrue*, 2011 WL 2174895 at *6 (C.D. Cal. June 3, 2011).

[13] Dr. Bammann and Dr. Ewing also offered findings related to Plaintiff's mental limitations.  However, Plaintiff does not challenge these findings, and addresses only portions of the opinion related to his physical limitations.  Accordingly, the Court finds any challenge to the remainder of the assessments of Dr. Bammann and Dr. Ewing is waived.  *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (the Court will "review only issues with are argued specifically and distinctly," and when a claim of error is not raised, the argument is waived).

34

apply to the facts at hand."[14]  (Doc. 11 at 24-25)  On the other hand, Defendant contends, "The ALJ properly considered the medical opinion evidence regarding physical impairment and gave less weight to the opinions from Drs. Ewing and Bammann." (Doc. 14 at 19, emphasis omitted)

Importantly, the opinions of Drs. Bammann and Ewing were contradicted by the opinions of Plaintiff's treating physician Dr. Richey—who believed "all of his disability is psychological" (Doc. 7-14 at 43)—as well as an examining physician (Dr. Vesali) and non-examining physicians (Drs. Fast, and Wong).  Accordingly, the ALJ was required to articulate "specific and legitimate reasons" to reject the opinions, supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830.

### a.    Opinions of Dr. Bammann

The ALJ indicated he gave "little weight" to the assessments offered by Dr. Bammann.  (Doc. 7-3 at 37)  The ALJ observed that Dr. Bammann opined on two occasions that Plaintiff "was disabled from any employment."  (*Id.* at 36)  However, the ALJ found it was "not clear that the doctor was familiar with the definition of 'disability' contained in the Social Security Act and Regulations," and it was "possible that the doctor was referring solely to an inability to perform the claimant's past work…" (*Id.*) Although the ultimate legal determination as to whether a claimant is disabled under the Social Security Act is to the Commissioner, the ALJ is still required to give legally sufficient reasons for rejecting a physician's opinions about the claimant's ability to work.  *See Reddick v. Chater*, 157 F.3d 715, 725 (explaining that a physician may render "medical, clinical opinions" or "opinions on the ultimate issue of disability," and that the reasons required to reject an opinion on the ultimate issue of disability are comparable to those required for rejecting a medical opinion); *see also Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir. 1985) ("[c]onclusory opinions by medical experts regarding the ultimate question of disability are not binding on the ALJ").

Here, the ALJ found Dr. Bammann's opinion was "quite conclusory, providing very little explanation of the evidence relied on in forming that opinion."  (Doc. 7-3 at 36)  Furthermore, the ALJ found the opinions offered by Dr. Bammann were "not well-supported by the totality of the objective

---

[14] As discussed below, the ALJ addressed the opinions offered by each physician separately. (*See* Doc. 7-3 at 35-36)  Thus, the Court rejects Plaintiff's assertion that the ALJ only "jointly" addressed the opinions of Drs. Bammann and Ewing.

evidence in the record," and contradicted Plaintiff's activities of daily living.  (*Id.*)  Finally, the ALJ determined that it appeared the opinion of Dr. Bammann was based "quite heavily upon the claimant's subjective complaints." (*Id.* at 37)  The Ninth Circuit has determined each of these reasons may support the decision to give less than controlling weight to the opinion of a treating physician.  *See Young,* 803 F.2d at 968; *Rollins,* 261 F.3d at 856*; Mendoza,* 371 Fed. App'x. at 831-32.

### i.    Lack of explanation regarding the limitations

The Ninth Circuit has determined an ALJ may reject reports of physicians "that did not contain any explanation of the bases of their conclusion."  *Crane v. Shalala,* 76 F.3d 251, 253 (9th Cir. 1996).  In the opinion dated March 1, 2011, Dr. Bammann conducted an examination of Plaintiff and noted an MRI showed Plaintiff had an MRI that showed "[m]ultilevel lumbar central stenosis and right L5-S1 foraminal stenosis."  (*See* Doc. 7-11 at 115-16)  Similarly, in the opinion dated February 22, 2012, Dr. Bammann noted she had conducted another exam, and that Plaintiff had an MRI showing "multilevel stenosis," carpal tunnel syndrome in his left hand, and "liver panel abnormalities."  (*See* Doc. 7-14 at 3)  Thus, Dr. Bammann identified clinical findings to support her diagnoses of Plaintiff's impairments.  However, as the ALJ found, Dr. Bammann's opinions were "quite conclusory," and did not explain her conclusion that these impairments caused the extreme limitations identified.  The lack of explanation from Dr. Bammann supports the ALJ's decision to give "little weight" to the opinion of Dr. Bammann.  *See Crane*, 76 F.3d at 253; *see also Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) ("the regulations give more weight to opinions that are explained than to those that are not").

### ii.    Totality of the evidence

An ALJ may reject an opinion when it is "unsupported by the record as a whole."  *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003); *see also Morgan v. Comm'r of the Soc. Sec. Admin*, 169 F.3d 595, 602-03 (9th Cir. 1999) (a medical opinion's inconsistency with the overall record constitutes a legitimate reason for discounting the opinion).  However, to reject an opinion as inconsistent with the medical record, the "ALJ must do more than offer his conclusions."  *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988).  The Ninth Circuit explained: "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases

1   have required." *Embrey*, 849 F.2d at 421-22.

2          Here, the ALJ found the limitations set forth by Dr. Bammann "contrast[ed] sharply with the

3   other evidence of record, including the claimant's activities of daily living[15], which renders it less

4   persuasive." (Doc. 7-3 at 36)  In addition, the ALJ found the "clinical notes, diagnostic test results, and

5   laboratory findings do not support the functional limitations assessed." (*Id.* at 37)  For example, the

6   ALJ noted Dr. Vesali performed a consultative examination where she observed that Plaintiff was "able

7   to get on and off the examination without difficulty; he could put on and take off his shoes without

8   difficulties; and his gait was slow but not particularly abnormal." (*Id.* at 33, Doc. 7-10 at 59)  In

9   addition, the ALJ observed that Dr. Vesali found Plaintiff "was able to ambulate without an assistive

10  device," and he "had full motor strength and muscle bulk and tone in his upper and lower extremities."

11  (*Id.*, citing Doc.7-10 at 61) Therefore, the ALJ carried his burden to identify conflicting evidence and

12  made findings to resolve the conflict. *See Cotton v. Bowen*, 799 F.2d at 1403, 1408 (9th Cir. 1986).

13                        *iii.     Reliance upon Plaintiff's subjective complaints*

14         The Ninth Circuit has determined that an ALJ may reject an opinion predicated upon "a

15  claimant's self-reports that have been properly discounted as not credible." *Tommasetti*, 533 F.3d at

16  1041; *see also Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) ("The ALJ thus disregarded [the

17  physician's] opinion because it was premised on Fair's own subjective complaints, which the ALJ had

18  already properly discounted. This constitutes a specific, legitimate reason for rejecting the opinion of a

19  treating physician.")  For example, in *Tommassetti*, the Court reviewed the physician's records, and

20  found "they largely reflect[ed] Tommasetti's reports of pain, with little independent analysis or

21  diagnosis." *Id.*, 533 F.3d at 1041.  Because the ALJ found the claimant's subjective complaints lacked

22  credibility, the Court concluded that "the ALJ's adverse credibility determination supports the limited

23  rejection of [the physician's] opinion because it was primarily based on Tommasetti's subjective

24  comments concerning his condition." *Id.*

25         Here, the ALJ noted Dr. Bammann opined Plaintiff "was unable to sit, stand, and/or walk for

26  more than 1 hour of an eight-hour workday; and he would not be able to sit continuously in a work

27  ───────────────

28      [15] As discussed above, an ALJ may also reject a physician's opinion when the restrictions "appear to be
    inconsistent with the level of activity that [the claimant] engaged in." *Rollins*, 261 F.3d at 856.

                                                         37

setting." (Doc. 7-3 at 36, citing Doc. 7-14 at 5)  Also, the ALJ observed that Dr. Bammann "opined the claimant could lift and/or carry up to 20 pound[s] occasionally and he has limitations in his ability to perform repetitive reaching, handling, fingering, and lifting;" "moderate limitations in his ability to grasp, turn, and twist objects …[and] in the ability to use his fingers for fine manipulations; and marked limitation in his ability to use his arms for reaching." (*Id.*, citing Doc. 7-14 at 6-7)  However, as the ALJ determined, Dr. Bammann did not identify any clinical testing for these limitations in her questionnaire.  Rather, Dr. Bammann noted Plaintiff complained he had a "constant" pain level of "7" on a scale of 0-10, and reported the pain was aggravated by "[a]ny movement, standing [and] walking." (Doc. 7-14 at 4-5)  Because the ALJ properly rejected the credibility of Plaintiff's subjective complaints, it was proper for the ALJ to give less weight to the opinions of Dr. Bammann because she relied upon Plaintiff's reports of pain.  *See Tommasetti*, 533 F.3d at 1041.

### b.    Opinions of Dr. Ewing

The ALJ indicated he did not adopt all portions of the assessment offered by Dr. Hope Ewing, who treated Plaintiff for cirrhosis. (Doc. 7-3 at 37)  The ALJ noted Dr. Ewing opined Plaintiff was able to "lift 20 pound[s] occasionally and 10 pounds frequently," and adopted these limitations in the residual functional capacity assessment. (*See id.* at 29, 37)  However, the ALJ gave "little weight" to the remainder of the opining, including the limitations concerning Plaintiff's ability to sit, stand, walk, and perform postural activities. (*Id.* at 37)  The ALJ found Dr. Ewing's opinion appeared "to rely quite heavily on the claimant's subjective complaints." (*Id.*)  The ALJ found also that "the clinical notes, diagnostic test results, and laboratory findings do not support the functional limits assessed." (*Id.*)  Furthermore, the ALJ concluded Dr. Ewing's limitations were "not consistent with the claimant's numerous activities of daily living…" (*Id.*)  As discussed above, the Ninth Circuit has determined each of these reasons may constitute a specific and legitimate reason for giving less weight to the opinion offered by a physician.  *See Young,* 803 F.2d at 968; *Rollins,* 261 F.3d at 856*; Mendoza,* 371 Fed. Appx. at 831-32.

### i.    Objective evidence

Dr. Ewing noted Plaintiff had "mild coagulopathy with an INR of 1.2," which supported her diagnosis that Plaintiff had "Alcoholic Cirrhosis." (Doc. 7-14 at 12, 15)  However, Dr. Ewing did not

explain her conclusion that Plaintiff's cirrhosis caused the limitations identified related to his ability to sit, stand, or walk.  Indeed, review of the questionnaire form completed by Dr. Ewing does not identify any clinical testing or objective findings by Dr. Ewing related to Plaintiff's ability to sit, stand, and walk.  (*See* Doc. 7-14 at 14-21)  The lack of explanation from Dr. Bammann and the failure to identify objective evidence supports the ALJ's decision to give "little weight" to the opinion of Dr. Ewing.  *See Crane*, 76 F.3d at 253; *Holohan*, 246 F.3d at 1202.

> ii.      *Reliance upon Plaintiff's subjective complaints*

As the ALJ noted, Dr. Ewing concluded Plaintiff "could sit, stand, and/or walk, for less than one hour out of an eight-hour workday; and he needs to move around every hour."  (Doc. 7-3 at 37, citing Doc. 7-14 at 16-17)  However, Dr. Ewing did not identify any objective evidence to support these conclusions in the records cited by the ALJ.  On the other hand, she indicated that Plaintiff reported that on a scale of 0-10, his pain level was a "7" and his fatigue was a "7."  (Doc. 7-14 at 16)  In addition, she said Plaintiff described his pain as "daily, constant," said it was aggravated by "movement, prolonged position."  (*Id.* at 16-17)  Given the lack of objective evidence identified by Dr. Ewing in support of her opinions, it appears she relied upon Plaintiff's subjective reports of pain and fatigue in formulating her opinions.  *See Tommasetti*, 533 F.3d at 1041.  Because the ALJ properly rejected the credibility of Plaintiff's subjective complaints, this was a specific and legitimate reason for the ALJ to give less weight to the opinions of Dr. Ewing.

> c.      Substantial evidence supports the RFC determination

When an ALJ rejects contradicted opinions of physicians, the ALJ must not only identify specific and legitimate reasons for rejecting those opinions, but the decision must also be "supported by substantial evidence in the record." *Lester*, 81 F.3d at 830.  Accordingly, because the ALJ articulated specific and legitimate reasons for rejecting the opinion of Dr. Bammann and portions of the opinion of Dr. Ewing, the decision must be supported by substantial evidence in the record.

The term "substantial evidence" "describes a quality of evidence ... intended to indicate that the evidence that is inconsistent with the opinion need not prove by a preponderance that the opinion is

wrong."  SSR 96-2p, 1996 SSR LEXIS 9 at *8[16].  "It need only be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion."  *Id.*  Here, the RFC determination that Plaintiff is able to perform a light work (including the ability to "lift and/or carry 20 pounds occasionally and 10 pounds frequently," "stand and/or walk for six hours out of an eight-hour workday" and "sit for six hours out of an eight-hour workday with regular breaks") with postural limitations is supported by opinions of Dr. Ewing, examining physician Dr. Vesali.

As the ALJ noted, Dr. Ewing concluded Plaintiff could "lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently."  (Doc. 7-3 at 37)  Similarly, Dr. Vesali believed Plaintiff retained this ability—finding after the examination that Plaintiff was able to "lift and carry up to 50 pounds occasionally and 25 pounds frequently.  (Doc. 7-10 at 58)  In addition, Dr. Vesali concluded that Plaintiff "should be able to walk, stand, and sit six hours in an eight-hour day with normal breaks."  (*Id.* at 61)  Dr. Vesali did not believe Plaintiff had postural, manipulative or environmental limitations.  (*Id.*)  Significantly, the opinion of an examining physician may be substantial evidence in support of the Commissioner's decision when the opinion is based upon independent clinical findings.  *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).  Because Dr. Vesali conducted an examination of Plaintiff, including testing his motor strength and range of motion, her conclusions were based upon independent clinical findings.  Thus, the opinion is substantial evidence in support of the RFC.

Dr. Roger Fast, a non-examining physician, concluded also that Plaintiff was able to lift and carry 20 pounds occasionally and 10 pounds frequently.  (Doc. 7-12 at 33)  Because the opinion of Dr. Fast was "consistent with other independent evidence in the record"—including the opinions of Drs. Ewing and Vesali—it also was substantial evidence supporting the lifting and carrying limitations articulated by the ALJ.  *Tonapetyan*, 242 F.3d at 1149.

---

[16] Social Security Rulings (SSR) are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner.  20 C.F.R. § 402.35(b)(1). Although they do not have the force of law, the Ninth Circuit gives the Rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations."  *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989); *see also Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006) ("SSRs reflect the official interpretation of the [SSA] and are entitled to 'some deference' as long as they are consistent with the Social Security Act and regulations").

Moreover, it appears the ALJ gave Plaintiff the benefit of the doubt by setting forth postural limitations in the RFC, although none were identified by Dr. Vesali.  The ALJ explained that "in light of the claimant's subjective allegations of low back pain and right ankle pain," he "precluded the claimant from climbing ladders, ropes, and scaffolds; and limited to no more than occasional stooping, crouching, kneeling, and crawling, or climbing ramps and stairs." (Doc. 7-3 at 38)  Given that the RFC was more restrictive than the limitations assessed by Dr. Vesali, the findings are supported by substantial evidence because, at a minimum, Plaintiff retains the ability to perform the tasks identified by the ALJ in the RFC.  *See, e.g. Ivory v. Colvin*, 2013 WL 6182573 at *8 (E.D. Cal. Nov. 25, 2013) (finding the ALJ did not err in evaluating the medical record where the ALJ found the claimant lacked credibility, but "assessed a more restrictive RFC" than the limitations identified by the consultative examiner, "giving [the] plaintiff some benefit of the doubt"); *Cortez v. Colvin*, 2014 U.S. Dist. LEXIS 61022 at *15-16 (CD. Cal. Apr. 30, 2014) (finding the ALJ did not err where the ALJ found the claimant was "less than fully credible" but nevertheless gave the claimant "the benefit of the doubt [and] found a more restrictive RFC" than those offered by consultative examiners).

Accordingly, the Court finds the RFC set forth by the ALJ is supported by substantial evidence in the record.

## VI.     Conclusion and Order

For the reasons set for above, the Court finds the ALJ identified clear and convincing reasons to find Plaintiff's subjective complaints lacked credibility that were "sufficiently specific to permit the court to conclude the ALJ did not arbitrarily discredit [the] claimant's testimony." *Thomas*, 278 F.3d at 958.   In addition, the ALJ identified legally sufficient reasons for giving little weight to the opinions of Drs. Bammann and Ewing. *See Tommasetti*, 533 F.3d at 1041; *Bayliss*, 427 F.3d at 1216.  Because the ALJ applied the proper legal standards and the residual functional capacity is supported by substantial evidence, the ALJ's determination that Plaintiff is not disabled must be upheld by the Court.  *Sanchez*, 812 F.2d at 510.

Accordingly, **IT IS HEREBY ORDERED**:

1.      The decision of the Commissioner of Social Security is **AFFIRMED**; and

2.      The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant

Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff
Jeff J. Coats, Sr.

IT IS SO ORDERED.

Dated:   **September 30, 2015**               **/s/ Jennifer L. Thurston**
                                          UNITED STATES MAGISTRATE JUDGE

42